

**FILED & ENTERED**

**MAR 08 2021**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY ghaltchi    DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Dana Hollister,<br><br>　　　　　　　　　Debtor(s) | Case No.:    2:18-bk-12429-NB<br><br>Chapter:    11<br><br>**MEMORANDUM DECISION DENYING DEBTOR'S FINANCING MOTION**<br><br>Hearing/Trial:<br>Date:  February 25, 2021<br>Time:  9:00 a.m.<br>Place: Courtroom 1545<br>　　　　255 E. Temple Street<br>　　　　Los Angeles, CA 90012 |

　　　The above-captioned Debtor argues that, on the facts of this case, a third lien is "indubitably equivalent" to a second lien.  It is not.[1]

**(1) Background**

　　　Approximately three years ago, on March 6, 2018 (the "Petition Date"), Debtor filed her chapter 11 petition.  Debtor's principal asset, known as The Paramour, consists of a main house and some guest houses on over four acres in the hills of the Silver Lake neighborhood of Los Angeles.

---

[1] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure or other federal or local rule, and other terms have the meanings provided in the Code, Rules, and the parties' filed papers.

Bobs LLC ("Bobs") currently holds a second lien on The Paramour. Debtor's motion (the "Financing Motion," dkt. 1335) seeks to borrow $7 million secured by a priming lien pursuant to § 364(d) (the "Priming Loan"). That would put Bobs in third position.

**(2) Debtor is desperate to stop the sale of The Paramour**

The goal of the $7 million Priming Loan is to stop the sale of The Paramour. The sale process has been triggered by Debtor's failure to make a final payment under a settlement agreement with other creditors, pursuant to which an "Agent" is now required to sell The Paramour. *See* Term Sheet (dkt. 547, and Fin. Motion, dkt. 1335, Ex. 13), p. 5, ¶ "7.f."; Orders (dkt. 528, 557, 1330); Broker Empl. App. (dkt. 1366).

Debtor estimates that any sale of The Paramour would render the bankruptcy estate administratively insolvent because of huge capital gains tax liability. *See* Reply (dkt. 1357), pp.13:18-21, 14:2-8. In addition, Debtor seeks to save the property for use as her home, and to continue its current use as a site for weddings, events, filming, and transient occupancy, or possibly develop it for other purposes. *See, e.g.*, Fin. Motion (dkt. 1335), Ex. 7 at Bates pp. 599-601.

**(3) Debtor relies on an allegedly huge equity cushion**

The estimated closing statement projects that junior lienholders would need to be paid roughly $3.7 million to stop the sale. The remainder of the proposed $7 million Priming Loan, after brokerage fees and other expenses, would pay $1 million of administrative expenses (Debtor's counsel and other professionals), $500,000.00 to replenish a fund that was designated for payment of unsecured creditors, $400,000 to the current first lienholder ("Select" or "SPS"), $550,000.00 to a friendly junior lienholder, and $559,300.00 to prepay interest on the $7 million Priming Loan for 12 months. Fin. Motion (dkt. 1335), p. 4:3-12 & Ex. 2.

The prepaid interest is necessary because Debtor has insufficient cash flow to pay interest on the proposed $7 million Priming Loan, let alone make adequate protection payments to Bobs or pay down any of her debts. Debtor hopes that in a year

she will be able to start making interest only payments of $46,608.33 per month on the $7 million Priming Loan.

As Bobs points out, "[t]here are no projections attached to the motion nor any reconciliation of her cash flow requirements without this loan much less adding $46,000 per month to her obligations."  Bobs Opp. (dkt. 1349), p. 10:9-11.  Debtor's accountant states only that "I looked at the Debtor's revenue and expenses from the inception of the case through early 2020 … [and] in late 2020 during which Covid restrictions were reduced," and based on that "look[]," "I believe that a monthly payment of $46,608.33 is within her means …."  Fin. Motion (dkt. 1335), p. 6:22-24 and at Bates p. 64:17-28.  Debtor also provides a list of alleged bookings of The Paramour, but that list is meaningless without detailed projections of resulting gross revenues, expenses, and net income.  *See also id.* Ex. 26.

Bobs also points out that in prior years, according to Debtor's own reporting, she did not earn sufficient income from The Paramour to service the debt.  *See* Bobs Opp. (dkt. 1349), p. 11:6-16.  In other words, Debtor offers only her hope that she will earn vastly more from The Paramour in future than she has ever done before.

Alternatively, Debtor's counsel suggested at oral argument that she might develop a boutique hotel on the property.  But she offers no explanation of who would fund that development, nor any evidence that a boutique hotel would be legally permissible notwithstanding zoning and other restrictions.  *Cf.* Appraisal (3/11/20), Fin. Motion (dkt. 1335), Ex. 10 at Bates pp. 825, 987 (PDF pp. 3 & 75 of 134) (property zoned for single family use, with limited building height; and The Paramour has been designated as historic-cultural monument, which "limits the allowable changes to the exterior of the improvements").

Another theoretical approach, according to representations of Debtor's counsel at oral argument, would be to subdivide the property into as many as 48 plots and develop single family homes on those plots.  Again, Debtor provides no evidence about who would fund that development, or that it is legally permissible.  *Cf. id.* ("the maximum

number of units that can be feasibly developed on this site under existing zoning [is] up to 35 homes ... but architectural/engineering studies would likely reduce this number due to circulation/access and possibly slope issues").

No time frame is provided for any of these possible strategies to exit this bankruptcy case. *See generally* Fin. Motion (dkt. 1335), p. 3:20-22 & n. 1 (proposed financing is only an "interim" measure). Regardless how long it might take Debtor to start paying Bobs, she asserts that meanwhile Bobs is adequately protected by an allegedly huge equity cushion above its interest in The Paramour, based on "**Debtor's estimate of value at $40 million**." Fin. Motion (dkt. 1335), p. 21:27 (emphasis added).

According to Debtor, that value results in an equity cushion so enormous that Bobs' proposed third priority lien will be the "indubitable equivalent" of its existing second priority lien. That is what Debtor must show under the applicable statutory provisions.

**(4) Statutory provisions**

This Bankruptcy Court "may authorize" Debtor to borrow funds secured by a lien that is senior to existing liens "only if - (A) the [debtor in possession, acting as a trustee under §§ 1101(1) and 1107(a),] is unable to obtain such credit otherwise [*i.e.,* without a priming lien]; and (B) there is **adequate protection** of the interest of the holder of the [senior] lien ...." § 364(d)(1) (emphasis added). Debtor "has the burden of proof on the issue of adequate protection." § 364(d)(2).

"[S]uch adequate protection may be provided by - (1) ... cash payment[s] [inapplicable because Debtor is not offering any such payments] ...; (2) ... an additional or replacement lien [also inapplicable] ...; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the **indubitable equivalent** of such entity's interest in such property." § 361 (emphasis added). Debtor relies on the emphasized language.

**(5) Legal interpretation of "indubitable equivalent"**

The Court of Appeals for the Ninth Circuit has construed the term "indubitable equivalent," albeit in the different context of "cram down" under § 1129(b)(2)(A)(iii). The Ninth Circuit has held that construction of that term is an issue of law. *In re Arnold & Baker Farms,* 85 F.3d 1415, 1421 (9th Cir. 1996). This Bankruptcy Court is not aware of any reason why a different meaning would apply under § 361(3) than under § 1129(b)(2)(A)(iii).

To the contrary, as Bobs has argued, the term "indubitable equivalent" is a very distinctive phrase, so it is unlikely that Congress meant something different by it in § 361 and § 1129. In addition, there is every reason to construe the same words to mean the same thing in both § 361 and § 1129 because both sections address how to assure that the present economic values of secured claims are not adversely affected. *See Arnold & Baker,* 85 F.3d 1415, 1423 ("the Code requires ... that the creditor receive the indubitable equivalent of its *secured* claim") (emphasis in original); *In re Den-Mark Construction, Inc.,* 406 B.R. 683, 702 (E.D.N.C. 2009) (under §§ 361 and 364, "the pre-petition secured creditor should be provided with the same level of protection it would have had if there had not been post-petition [priming] financing") (citation and internal quotation marks omitted).

Therefore, this Bankruptcy Court applies the definition quoted with approval by the Ninth Circuit in *Arnold & Baker*. "Indubitable" means "**too evident to be doubted**." *Arnold & Baker,* 85 F.3d 1415, 1421 (emphasis added) (quoting *In re Arnold & Baker Farms,* 177 B.R. 648, 661-62 (9th Cir. BAP 1994), itself quoting *In re Walat Farms Inc.,* 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987)). *See also In re Tempe Land Co., LLC,* 2009 Bankr. Lexis 1137 at *4 (Bankr. D. Ariz. May 1, 2009) (applying "too evident to be doubted" definition of "indubitable," from *Arnold & Baker,* to reject proposed DIP financing under §§ 361 and 364); *In re Pac. Lifestyle Homes, Inc.,* 2009 Bankr. Lexis 711 at *24-25 (Bankr. W.D. Wash. Mar. 16, 2009) (applying "too evident to be doubted"

definition, from *Arnold & Baker,* to reject proposed use of cash collateral under §§ 361 and 363(c)).

**(6) The parties' arguments**

Debtor argues:

> Within the Ninth Circuit, an "equity cushion" has been characterized as the "classic" form of adequate protection which, standing alone, is often sufficient to satisfy the statutory standard even in circumstances where no mortgage payments have been made. *In re Mellor,* 734 F. 2d 1396, 1400 (9th Cir. 1984).
>
> As further outlined in *Mellor, Id.* at p. 1401, … [j]unior liens or encumbrances are not relevant to [the] determination [of whether there is an equity cushion protecting the subject lien]. [Fin. Motion (dkt. 1335), pp. 20:24-21:5]

Debtor asserts that, under *Mellor*, a 20% equity cushion is *de facto* adequate protection and that Bobs' equity cushion is far above 20%, so Bobs is adequately protected regardless whether "Debtor's estimate of value at $40 million is correct." Fin. Motion (dkt. 1335), p. 21:27-22:2. Debtor also argues that § 364(d) would be read out of existence if lienholders could not be primed.

But, as Bobs points out, it is one thing for a debtor to obtain a priming lien to improve the collateral, or to make adequate protection payments while pursuing a feasible exit strategy, but it is another thing for Debtor to propose the $7 million Priming Loan with none of such protections. *See, e.g.*, *Tempe,* 2009 Bankr. Lexis 1137 at *3 (rejecting proposed $7.9 million priming loan which would "see only about $1.4 to $2.0 million actually used in the existing project"); *Pac. Lifestyle Homes,* 2009 Bankr. Lexis 711 at *34-35 (rejecting proposed use of cash collateral to develop homes when "there is no guaranty that the homes will sell, or will sell in a timely manner, sufficient to compensate the Lenders for the loss of approximately eight million dollars in cash that is available to them today").

As Bobs argues, "[f]or a priming lien, the proposal must provide the secured creditor with the same level of protection it would have had had there not been postpetition [priming] funding." Bobs Opp. (dkt. 1349), p. 7:1-4. *See In re Swedeland*

*Development Group, Inc.*, 16 F.3d 552, 564-66 (3rd Cir. 1994); *In re Plabell Rubber Products, Inc.,* 137 B.R. 897 (Bankr. N.D. Ohio 1992). *Compare In re San Clemente Estates,* 5 B.R. 605, 609-612 (Bankr. S.D. Cal. 1980) (cited with approval in *Mellor,* 734 F.2d 1396, 1400) (denying relief from automatic stay due to equity cushion of "over 65%" combined with (i) tentative agreements for pre-sale of lots, (ii) likely extension of subdivision permit, and (iii) residual value of property and refund from city even if such extension were denied).

To be clear, this Bankruptcy Court agrees with Debtor that, *theoretically,* a sufficiently huge equity cushion might mean that in practical terms a third priority lien is every bit as protected as a second priority lien, even without adequate protection payments, replacement liens, additional liens, improvement of the collateral, or any exit strategy supported by realistic projections. *See* Reply (dkt. 1357), pp. 5:26-6:3. In fact, this Bankruptcy Court has declined to sustain Select's objection to the Financing Motion because *conceivably* Debtor could establish that Select is adequately protected, after considering its extra $12.5 million equity cushion (the approximate amount of Bobs' claim).

But as against Bobs, Debtor has not shown any way that the equity cushion could be large enough, and stable enough. Debtor "has the burden of proof on the issue of adequate protection" (§ 364(d)(2)) and she has failed to carry that burden.

**(7) Debtor has failed to "do the math"**

As Debtor correctly notes, the existence of an equity cushion is determined by starting with the value of the property, deducting senior liens or encumbrances, and assessing whether there is sufficient remaining equity to protect the lien in question. Fin. Motion (dkt. 1335), p. 21:1-5. But Debtor has failed to do that calculation: she has not compared (a) the protection of Bobs' interests without the proposed $7 million Priming Loan ("Scenario One") with (b) the protection of Bobs' interests if that Priming Loan were to be approved ("Scenario Two"). *Cf.* Fin. Motion (dkt. 1335), p. 6:6-9:3.

Debtor's failure to do the math is fatal to the Financing Motion.  On its face, a third lien is not equivalent to a second lien absent extraordinary circumstances, and in any event the burden is on Debtor to establish that they are "indubitabl[y] equivalent." So Debtor had to make some initial showing that, if proved at trial, would be sufficient to grant her motion.  Debtor has not made any such showing.  *See generally Swedeland*, 16 F.3d 552, 566 (reversing bankruptcy court's order approving priming lien when cash flow projections were "deficient as they did not provide for a reasonable developer's profit nor discount the projected eight-year cash flow to present value").

Alternatively, this Bankruptcy Court provides the following analysis to illustrate how Bobs' proposed third lien demonstrably is not equivalent to its existing second lien. This Bankruptcy Court emphasizes that the following analysis is solely for illustrative purposes.[2]

### (8) Valuation of The Paramour

Bobs asserts that The Paramour is worth "no more than $17 million and likely closer to **$12 million**."  Bobs Opp. (dkt. 1349) p. 12:9-10 (emphasis added).  That is a world apart from "**Debtor's estimate of value at $40 million.**"  Fin. Motion (dkt. 1335), p. 21:14-15 & p. 21:27 (emphasis added).

Debtor's estimate has several weaknesses.  Those weaknesses might be understandable in the circumstances of this case, but they mean that any valuation in the $40 million range that she proposes must be subject to a substantial margin of error.

### (a) Debtor's lack of market valuation

Bobs contends:

---

[2] At the above-referenced hearing Debtor requested a certification for a direct appeal to the Ninth Circuit.  28 U.S.C. § 158(d)(2).  As set forth on the record at that hearing, this Bankruptcy Court concludes that it must make such a certification, because denial of the Financing Motion "involves a question of law as to which there is no controlling decision of the [Ninth Circuit] or of the Supreme Court of the United States" – namely, whether the "too evident to be doubted" standard warrants denial of a proposed priming loan without any evidentiary hearing. Alternatively, the matter involves "a matter of public importance" because of the potentially far reaching impact of priming loans.  Of course, the Ninth Circuit still must authorize any direct appeal; it might prefer to let lower courts address the issues before rendering its own ruling; and nothing in this Bankruptcy Court's certification should be construed as favoring a direct appeal – this Bankruptcy Court is simply following its understanding of the statutory directive for certification.

> To argue that this property is worth even $20 million is pure hopeful speculation. As the Ninth Circuit said in *In re Arnold & Baker Farms,* 85 F.3d 1415, 1421 (9th Cir. 1996), "Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, *the precise value of land is difficult, if not impossible, to determine until it is actually sold*." [*Id.*] (quoting the BAP's opinion at 177 B.R. at 661-62). [Bobs Opp. (dkt. 1349), p. 13:9-14 (emphasis added by Bobs).]

Bobs is correct that a sale is the preferred valuation method. But as noted above a sale of The Paramour likely will trigger very large capital gains taxes, possibly rendering the estate administratively insolvent.

Another marketplace solution would be to refinance the property with a loan sufficient to pay at least Bobs' lien and senior liens. But Debtor asserts that she has been unable to find any better refinancing than the proposed $7 million Priming Loan, despite her allegedly diligent attempts.

Another marketplace solution would be to find an equity investment in a dollar amount sufficient to pay Bobs and senior liens. But Debtor asserts that this has not been possible to date.

Debtor has presented very thin evidence of any efforts to obtain a refinancing or equity investment. It is also unclear what terms she considered "unacceptable," as pointed out by Bobs and Select. *See* Fin. Motion (dkt. 1335), pp. 19:18-20:14; and *id.* at Bates pp. 39:15-40:4, 42:25-43:2, 56:25-57:2, 59:14-23 (Debtor's vague allegations).

But those things are disputed factual issues. This Bankruptcy Court presumes, solely for purposes of this discussion, that Debtor could explain why the refinancing market and equity investors would not invest enough to pay off Bobs and Select, despite the allegedly enormous value of The Paramour.

In any event, Debtor seeks a valuation by this Bankruptcy Court. She concedes that this is less reliable than valuation by the market, but she asserts that this Bankruptcy Court has a duty to conduct an evidentiary hearing.

**(b) Past valuations have varied dramatically**

According to Debtor, she purchased The Paramour in 1998 for $2.25 million (after being in contract for a lengthy period). Then the property may have soared in value, based on appraisals for $12.1 and $16.9 million in 2006 and 2009, respectively. But then the property may have dropped drastically in value based on a 2011 appraisal for $6.5 million. Thereafter, the property may have soared in value again, up to an appraisal a few days ago for $48 million. *See* Reply (dkt. 1357), Ex. 31, pp. 44-45 (at PDF p. 49) (summarizing numerous appraisals).

Of course, the appraisals could be mistaken. In addition, it is conceivable that they were intentionally skewed, as Debtor has suggested. The point is only that there is a very wide range of past valuations over time, which reinforces the potential difficulties in any court valuation.

True, this Bankruptcy Court regularly values residential and other properties. This Bankruptcy Court is quite willing to value The Paramour, all the more so because it appears to present unique and interesting challenges. But this Bankruptcy Court also recognizes that there is a margin of error in any court finding of value.

**(c) Valuation of extremely high end "estate homes" is particularly inexact**

As is typical, the appraisals look to other properties that allegedly are comparable ("comps"). Some appraisers (notably Mr. D'Angelo, the appraiser most cited by Debtor) use comps that literally are "all over the map": from neighborhoods such as Bel Air, Holmby Hills, and Brentwood. *See, e.g.*, Fin. Motion (dkt. 1335), Ex. 7 at Bates pp. 605 & 618 (D'Angelo $44m Appraisal, 2018); *id.* Ex. 5, at Bates pp. 344 & 357 (D'Angelo $36m Appraisal, 2017). *But compare, e.g.*, Fin. Motion (dkt. 1335), Ex. 3 at Bates p. 147 (closer comps, but much lower value of $17 million, in 2014).

Using such distant comps, in very different neighborhoods, violates the top three mandates in valuing real estate: "location, location, location." *See, e.g., In re Whittaker Memorial Hosp. Ass'n, Inc.,* 149 B.R. 812, 813 (Bankr. E.D. Va. 1993).

Normally any appraiser who used such comps would be laughed out of court. But for present purposes this Bankruptcy Court presumes that such distant comps *might* be necessary, because so few properties are sold in the price range that Debtor hopes to establish for The Paramour.

For example, one appraisal states that (as of 2019) there were only "475 active home listings priced above $10,000,000 in Los Angeles County" and [t]his declines to 131 home[s] priced in excess of $25,000,000."   Fin. Motion (dkt. 1335), Ex. 10 at Bates p. 878 (D'Angelo appraisal).  No data is offered for homes in the $40 million range.

Nevertheless, even assuming for purposes of discussion that it is necessary to use distant comps, that does not make such comps reliable.  To the contrary, it makes valuations based on such comps particularly inexact.

Similarly, the individual characteristics of extremely high end properties vary far more than more regular homes.  That is evidenced by this Bankruptcy Court's review of the appraisals in this case (as compared with appraisals in numerous other cases in which this Bankruptcy Court has reviewed valuations over the years).

The Paramour has panoramic views of downtown Los Angeles, and a huge amount of acreage (for Los Angeles), but the value of those things is difficult to quantify. Some buyers prefer ocean views, or vistas of tree covered mountains.  The amount of land might not be attractive to any buyers who suspect that the land cannot be used as they would like because of its slope, zoning, historical designation, or other reasons; but conversely some buyers would value the property precisely because of its undeveloped state.

Other characteristics of properties include how many bedrooms and bathrooms the estate home has, or the total square footage.  One such home might have a master suite that "goes on for miles," while another has two or three (relatively) smaller bedroom suites in the same space, or detached guest houses, and each configuration might appeal to or deter different buyers.

Amenities and upgrades also vary enormously.  Different buyers might want an elevator, a large wine room cooled without any vibrations from refrigeration, an "infinity" or "plunge" pool with specific dimensions, or a tennis court with panoramic views.  Some buyers would be willing to add their own amenities, but others would not.

The point is not whether this Bankruptcy Court accepts what any appraiser states.  The point is that the individual characteristics of extremely high end properties are difficult to value.

In sum, the relevant market appears to be particularly susceptible to the individual proclivities of very wealthy buyers.  None of this means that valuation by this Bankruptcy Court is impossible.  But it does mean that any valuation is subject to a very large margin of error.

### (d) Hypothetical, illustrative valuation, and margin of error

This Bankruptcy Court emphasizes that the purpose of the following math is only to illustrate the sorts of calculations that Debtor has *not* shown, and to illustrate that Bobs easily *could be* adversely affected if the Financing Motion were granted.  In that context, suppose that this Bankruptcy Court were to value The Paramour at the *full amount* of Debtor's **$40 million** estimate.  What margin of error would apply to that valuation?

Recall that Debtor must prove an equity cushion large enough that Bobs' proposed third lien position will be the "indubitable equivalent" of its current second lien position.  In other words, after accounting for the margin of error, Debtor would have to establish at trial that the equivalence between the proposed third lien and the current second lien is "too evident to be doubted."

For purposes of illustration, suppose a 20% margin before this Bankruptcy Court could find that the "too evident to be doubted" standard was met.  That is a very modest adjustment relative to the range of values argued by the parties (from $12 million to $48 million).  It is also a modest margin on which to base a finding of "indubitable" equivalence, considering all the uncertainty generated by using distant comps, in very

-12-

different neighborhoods, with very different characteristics from The Paramour. Nevertheless, this discussion assumes (in Debtor's favor) that the margin of error would be no greater than 20%.

Applying this 20% margin of error to the hypothetical $40 million valuation results in a $8 million margin of error ($40 million x 0.2 = $8 million). In other words, for purposes of the following calculations this Bankruptcy Court presumes that the minimum value to meet the "too evident to be doubted" standard of indubitable equivalence would be **$32 million** ($40 million - $8 million = $32 million). Again, this is solely for purposes of illustration.

**(9) Scenario One: adequate protection of Bobs' interest *without* the $7 million Priming Loan**

Debtor estimates *at least* a year to market and sell The Paramour. *See* Reply (dkt. 1357), p. 20:6-11. Suppose that by then the property has declined by 9% in value (to match the rate of decline assumed in Scenario Two below), which equates to a **value of $29.1 million** ($32m x 0.91 = $29.1m). Suppose further that, after interest and other charges, **Select is owed $5.4 million**.[3] Finally, suppose a net debt to Bobs, after sale of other collateral, of $10.5 million,[4] growing to **$12.5 million owed to Bobs** when

---

[3] Select's interest rate is equal to an index ("LIBOR") plus 1.875%. *See* Promissory Note, Fin. Motion (dkt. 1335), Ex. 11 at Bates pp. 980-81, *and* Payoff Statement, Reply (dkt. 1357), Ex. 29, at Bates p. 36. This Bankruptcy Court cannot assume that interest rates will stay at their current levels, which Debtor admits are "at historic lows." Fin. Motion (dkt. 1335), p. 7:15-17. Therefore, in assessing the potential risk to Bobs, suppose that LIBOR were to increase to a historically modest 4% and that Select's average interest rate over the next year were to be roughly 6% (just under what it was at the inception of the loan). That would add $300,000.00 in interest ($4.5 million x 0.06 = $300,000.00). After late charges, attorney fees, etc., the following illustrative calculations presume an additional $0.4 million, on top of the current $5 million, for a total hypothetical amount of $5.4 million owed to Select by the time Bobs is paid (if the Financing Motion is not granted).

[4] Bobs asserts that it is owed approximately $12.5 million. Debtor disputes some of that claim, but "adequate protection" would not be very adequate if it only protected the portion of a secured claim to which a debtor agreed (without any court estimate). Debtor has not established that the claim can be estimated at anything less than the full $12.5 million.
   Bobs' $12.5 million claim is secured by The Paramour and one other property. In Debtor's favor, assume that this other property is sold soon, for net proceeds of $2 million, leaving roughly $10.5 million secured by The Paramour. *But cf.* Fin. Motion (dkt. 1335), pp. 24:23-26:24 (conceding "significant dispute" on this issue).

it is (hypothetically) paid a year from now.[5]  In this scenario, *without* the proposed $7 million Priming Loan, Bobs' equity cushion would be roughly as follows:

```
SCENARIO ONE:
 $  29.1 million hypothetical value for purposes of "indubitable equivalent" test
-$   5.4 million, Select (1st lien)
-$  12.5 million, Bobs (2nd lien)
-$   1.7 million for costs of sale ($29.1m x 0.06 = 1.7m)[6]
=$   9.5 million equity cushion
```

In sum, Bobs' second lien is protected in this Scenario One (*i.e., without* the $7 million Priming Loan) by a hypothetical **$9.5 million equity cushion**.

**(10) Scenario Two: if Debtor's Financing Motion were granted**

**(a) Delay**

The picture would be very different if Debtor's Financing Motion were granted.  In that situation the Agent would cease marketing The Paramour, and the one year marketing period would not even *begin* until after Bobs were granted relief from the automatic stay, or equivalent relief such as appointment of a chapter 11 or 7 trustee to sell the property.

How long would it be before Bobs could seek such relief?  It could be years.

Recall that Debtor has made no commitments to refinance, to find an equity investor, or to meet any other benchmarks in any time frame.  Nor has Debtor made any commitments to Bobs that would be a basis for Bobs to assert a breach of promise.

To obtain any sort of relief Bobs most likely would have to show a decline in the (hypothetical) equity cushion.  This Bankruptcy Court cannot presume that Bobs could

---

[5] Bobs asserts a 17% default rate of interest, and Debtor has not established otherwise.  *See* Promissory Note ¶¶ 2-4(D) (Fin. Motion, dkt. 1335, Ex. 12 at Bates p. 1001).  Therefore, the following illustrative calculations presume that, in addition to the net $10.5 million secured by The Paramour, Bobs would claim roughly $1.8 million of additional interest for the year before Bobs is paid ($10.5 million x 0.17 = $1,785,000.00).  Including late charges, attorney fees, etc., the following illustrative calculations presume an additional $2 million owed to Bobs, on top of the current net $10.5 million, for a total hypothetical debt of $12.5 million owed to Bobs by the time Bobs is paid.

[6] Like Debtor, this Bankruptcy Court uses a hypothetical 6% for costs of sale.  *See* Reply (dkt. 1357), p. 14:2-7.  Debtor has not established that anything below that 6% would be appropriate in measuring Bobs' projected equity cushion.  *See also* Empl. App. (dkt. 1366), p. 5:8 *and* Ex. 1 at Bates p. 30, Addendum ¶ 4.1 (proposed broker's 4% commission, not including expenses, transfer taxes, etc.).

make that showing quickly.  For purposes of illustration, assume that The Paramour were to maintain its value for many months, and then suffer an unexpected and rapid decline resulting in this Bankruptcy Court granting relief to Bobs.

Of course, this Bankruptcy Court recognizes that the situation could be much more rosy.  The value of The Paramour could increase, or Bobs theoretically could obtain relief quickly and easily, before any threat to its equity cushion.  But there would be no point in "adequate protection" if it only protected Bobs' lien when things went well.

This Bankruptcy Court must consider whether Bobs' interest is protected if the value of The Paramour were to decline and, for example, a sale of The Paramour occurred **two years** from now.  The actual period could be much longer but, in Debtor's favor, this Bankruptcy Court assumes only two years.[7]

**(b) Possible loss of value in two years**

How much might The Paramour decline in value in two years?  Debtor cites several appraisals by Mr. D'Angelo, who provides the highest valuations, and his appraisals show a recent increase in value averaging 9% per year.  What goes up can go down.  Applying a decline equivalent to 9% per year to the hypothetical $32 million

---

[7] The delay could be anything – six months, 36 months, or any other time.  The point is only that, until whatever future time Bobs is able to realize on its collateral, the equity cushion has to be large enough to protect Bobs against a decline in value, or an increase in senior liens or Bobs' own claim.

In considering a future decline in value, keep in mind that, as some of the appraisals note, the market for extremely high end estate homes does not necessarily track the rest of the real estate market, so it may be difficult to know for many months that this very high end market is in decline.  At that point Bobs could file a motion for relief from the automatic stay (or for other relief), but in all likelihood there would have to be discovery and a trial on valuation.

In addition, although a nonjudicial foreclosure can be completed in as little as a few months, nonjudicial foreclosure is famous for producing far less than market values.  *See, e.g., BFP v. Resolution Trust Corporation,* 511 U.S. 531, 536 & 561 n. 13 (1994) (foreclosure sale for 57% of fair market value; and noting 70% benchmark previously used by lower courts for fraudulent transfer purposes).  So this Bankruptcy Court will presume (again, in Debtor's favor) that Bobs would seek to *maximize* value by pursuing remedies for a more orderly marketing and sale process, such as seeking appointment of a trustee (§ 1104) or filing an action for judicial foreclosure and seeking appointment of a receiver to market and sell The Paramour, much as the Agent is doing now.  That would take time.

In addition, Debtor could use various means to cause further delay.  If the past is prologue, Debtor could engage in a lot of litigation.  In addition, desperate debtors have been known to engage in all manner of schemes to delay the loss of their properties.  *See, e.g., In re Vazquez,* 580 B.R. 526 (Bankr. C.D. Cal. 2017).

The point is, this Bankruptcy Court cannot presume that Bobs could obtain relief quickly, before any decline in value of The Paramour, or before any increase in senior liens and Bobs' own claim.

valuation, The Paramour could have a value of **$26.5 million** by the time Bobs could force a sale.[8]

### (c) Possible increases in senior liens, and Bobs' claim

This Bankruptcy Court cannot assume that senior liens will be paid, especially when Debtor has not been paying the existing liens and does not currently have the cash flow to do so. *See, e.g.,* Select Opp. (dkt. 1346), p. 6:1-3 & Ex. A; Bobs Opp. (dkt. 1349), p. 8:5-6. Nor can this Bankruptcy Court assume that interest rates will stay at their current levels, which Debtor admits are "at historic lows." Fin. Motion (dkt. 1335), p. 7:15-17. Nor can this Bankruptcy Court assume that senior lienholders and Bobs will have no attorney fees, or other costs and expenses allowable under § 506(b).

Suppose that by the time Bobs could obtain a sale of The Paramour, **the Priming Loan grew to $8 million** from its original $7 million.[9] Select's debt would receive a $400,000.00 payment under the proposed financing; but after interest and other charges Debtor could owe **$5.2 million to Select**.[10] Debtor would owe approximately **$14.5 million to Bobs**.[11]

---

[8] The D'Angelo appraisals range from $36 million as of August 24, 2017 (Fin. Motion, dkt. 1335, Ex. 5, at Bates pp. 274-400) to $48 million as of a few days ago. *See* Reply (dkt. 1357), Ex. 32, at Bates pp. 48-187. That is an increase of $12 million in just under three and a half years, or about 9% per year. (In rough figures: $36m x 1.09 = $39m; $39m x 1.09 = $42.5m; $42.5m x 1.09 = $46m; $46m x 1.045 (the last half year) = $48m.)

Applying the same rate of change (9%), the hypothetical $32 million value of The Paramour today could decline to $26.5 million in two years. (In rough terms, using D'Angelo's 9% annual rate of change would mean a decline from 100% to 91% each year: $32m x 0.91 = $29.1m; and $29.1m x 0.91 = $26.5m.) Such a "correction" would not necessarily be unusual, after a period of "several years of rapid price appreciation." D'Angelo Appraisal (3/11/20), Fin. Motion (dkt. 1335), Ex. 10 at Bates p. 879.

[9] Suppose that Debtor does not pay interest on the proposed $7 million Priming Loan when such payments are due to commence in a year. The proposed Priming Loan bears interest at 7.99%, with default interest at 12.99%. *See* Promissory Note, ¶¶ 2-4(D) (Fin. Motion, dkt. 1335, Ex.1 at Bates p. 71). Interest for a year at 12.99% on $7 million is $909,300.00. With late charges, attorney fees, and other costs and expenses, the following illustrative calculations use a figure of an additional $1 million owed on the Priming Loan, on top of the $7 million principal, by the time Bobs can realize on its collateral, for a total of $8 million owed on the Priming Loan.

[10] The $400,000 payment to Select would reduce its current $5 million claim to $4.6 million. But, as in Scenario One above, suppose that Select's average interest rate were 6%. This would add over $0.5 million ($4.6 million x 0.06 x 2 = $552,000), and after late charges, attorney fees, etc., the following illustrative calculations presume an additional $0.6 million, on top of the post-financing $4.6 million, for a total of $5.2 million owed to Select.

[11] As in Scenario One, suppose that Bobs' net debt was $10.5 million with interest at 17%, but this time Bobs would go unpaid for two years instead of one. *See* Promissory Note ¶¶ 2-4(D) (Fin. Motion, dkt. 1335, Ex. 12 at

Bobs easily could be faced with the following situation if the Financing Motion were granted (even with this Court's many assumptions in Debtor's favor):

> SCENARIO TWO:
> $    26.5 million hypothetical value for purposes of "indubitable equivalent" test
> -$    8.0 million, Priming Loan (1st lien)
> -$    5.2 million, Select (2nd lien)
> -$   14.5 million Bobs (3rd lien)
> -$    1.6 million for costs of sale
>            ($26.5m x 0.06 = $1.6m; *see also* Reply, dkt. 1357, p. 14:2-7)
> = -$   2.8 million equity cushion

This **negative $2.8 million** is a very far cry from the $9.5 million equity cushion in Scenario One above.

### (11) Summary of Scenario One and Scenario Two

The foregoing hypotheticals include a string of assumptions in Debtor's favor. They assume that the Paramour would be valued at $40 million – the *full* dollar amount that Debtor has suggested. They assume only a 20% margin of error to establish adequate protection "too evident to be doubted," despite all the uncertainty in valuing extremely high end estate homes. They assume that Bobs' lien will be reduced by the full $2.0 million net proceeds that Debtor hopes to achieve from selling other collateral. They assume that Bobs could have cash in hand within two years, despite the lengthy periods before Bobs could (A) plausibly file a motion for relief from the automatic stay (or equivalent relief), (B) engage in discovery, (C) conclude an evidentiary hearing and obtain such relief, (D) obtain appointment of a trustee or receiver to market and sell The Paramour, (E) have the trustee or receiver select a real estate broker, and resolve any disputes about that selection, (F) engage in what Debtor herself estimates would be at least a year of marketing before the property could be sold, (G) close any such sale, even though Debtor herself took several years to close her purchase of the property, according to her counsel at oral argument, and (H) resolve any disputes over Bobs'

---

Bates p. 1001). That results in roughly $3.6 million of additional interest ($10.5m x 0.17 x 2 = $3.57m). After including late charges, attorney fees, etc., the following illustrative calculations presume an additional $4 million owed to Bobs, on top of the current $10.5 million (net of the other collateral being sold), for a total of $14.5 million owed to Bobs.

claim and receive distributions out of any claims reserve.  The hypotheticals assume that any decline in value of the property would be no steeper than its recent (alleged) increases in value (9% per year), despite the real estate market's sudden plunges in the past.  The hypotheticals assume a variable rate on Select's lien of only 6%, lower than the original rate.

Even with all of those assumptions in Debtor's favor, the math does not favor her Financing Motion.  An equity cushion of **negative $2.8 million** in one entirely possible scenario after the proposed financing (Scenario Two) is nowhere near equivalent to a **$9.5 million** equity cushion *without* the proposed $7 million Priming Loan (in Scenario One).

In reality the situation is far less favorable to Debtor's position.  First, under the "too evident to be doubted" standard this Bankruptcy Court could not justify making numerous assumptions in Debtor's favor (as the above discussion does).  Second, the hypotheticals make no adjustment due to the COVID-19 pandemic (according to some appraisers, the pandemic has yet to affect the market for extremely high end estate homes).  Regardless of one's politics or views about scientists and policy makers, it is easy to conceive that real estate like The Paramour in dense urban neighborhoods could go out of fashion for extremely wealthy buyers, especially if new variants of the virus were to spread.

Nor does Debtor's last-minute suggestion to reduce the $7 million Priming Loan by $2.8 million change the analysis.  At most that would increase to $0 Bobs' equity cushion in Scenario Two and, again, that is only with a string of assumptions in Debtor's favor.  Even if Bobs theoretically could achieve an equity cushion above $0 in Scenario Two, that would be nowhere near equivalent to the millions of dollars of equity cushion in Scenario One.

Likewise, other adjustments do not materially change the analysis.  For example, even if this Court were to assume a valuation above the highest appraisal presented by

-18-

Debtor, such as $50 million, this would only mean that The Paramour had skyrocketed in value and, as noted before, what goes up can go down (fast).

In sum, there is simply too large a gulf between Bobs' proposed third lien, behind the proposed $7 million Priming Loan, and its existing second lien. Debtor has not met her burden to show how they are "indubitably equivalent." To the contrary, this Bankruptcy Court's own hypotheticals illustrate that they are not.

**(12) Conclusion**

This Bankruptcy Court is hesitant to rule on the Financing Motion without an evidentiary hearing. But this Bankruptcy Court also is not prepared to force all parties into an expensive trial on valuation when such a trial is pointless under this Bankruptcy Court's understanding of Ninth Circuit precedent.

Vast sums have been spent on litigation in this case – approaching $4 million of administrative expenses, according to Debtor's counsel at oral argument, not to mention attorney fees that do not qualify as expenses of administration. *See also* Fin. Motion (dkt. 1335) p. 11:8-26. Debtor has not met her burden to show how she could possibly prove at trial that Bobs' proposed new third priority lien, behind the proposed $7 million Priming Loan, would be the "indubitable equivalent" of Bobs' current second priority lien. Far from being "too evident to be doubted," Debtor's assertion is demonstrably false.

For all of the above reasons, the Financing Motion will be DENIED by separate order.

###

Date: March 8, 2021

Neil W. Bason
United States Bankruptcy Judge